FILED

NOV – 3 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SUSAN CARSON<br>5517 Dowgate Court<br>Apt. 204<br>Rockville, MD 20851 | )<br>)<br>)<br>)<br>) |
| Plaintiff, | ) |
| v. | CASE NUMBER  1:05CV02159 |
| MICHAEL O. LEAVITT,<br>SECRETARY<br>U.S. DEPARTMENT OF HEALTH &<br>HUMAN SERVICES,<br>NATIONAL INSTITUTES OF HEALTH<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201 | JUDGE: Henry H. Kennedy<br><br>DECK TYPE: Employment Discrimination<br><br>DATE STAMP: 11/03/2005 |
| Defendant. | )<br>)<br>)<br>)<br>) |

**JURY ACTION**

## COMPLAINT

1. Plaintiff Dr. Susan Carson brings this action for damages based on the denial of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 (hereafter "Title VII"). The Department of Health and Human Services (hereafter "DHHS" or the "Agency") discriminated against Dr. Carson on the basis of her sex (female) and national origin (British). When Dr. Carson complained about this discriminatory treatment, she was harassed and subjected to retaliation in further violation of Title VII.

1

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 1343(a)(3), and 1343(a)(4) and 42 U.S.C. § 2000e-5.

3. Pursuant to 28 U.S.C. § 1391(e) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in the District of Columbia which is the location where Defendant has its principal office and where, upon information and belief, the employment records relevant to the Complaint are located.

## PARTIES

4. Dr. Carson, a U.S. Citizen, is a female whose national origin is British (United Kingdom) and who speaks with a British accent. She is presently employed by the U.S. Department of Health and Human Services, National Institutes of Health (hereafter, the "Agency" or "NIH"). Dr. Carson is a Technology Licensing Specialist (TLS), GS-601-13, in the General Medicine Group ("GMG"), Division of Technology Development and Transfer ("DTDT"), Office of Technology Transfer ("OTT"), Office of Intramural Research ("OIR"), Office of the Director ("OD"). Her position has a career ladder promotion potential to GS-14.

5. Despite Dr. Carson's fully satisfactory performance, demonstrated ability and qualifications, the Agency discriminated against her on the basis of gender and national origin and subjected her to adverse action which negatively impacted the terms and conditions of her employment. In response, Dr. Carson filed internal complaints with NIH and, subsequently, an EEO charge and an EEOC complaint protesting the Agency's to unlawful discriminatory conduct and actions. After

filing these complaints, the Agency harassed Dr. Carson because of her gender, national origin and for engaging in protected activities. Dr. Carson was treated disparately in many aspects of the terms, conditions and privileges of her employment.

6. Defendant Michael O. Leavitt is the Secretary for the DHHS. The Secretary is being sued in his official capacity as provided by law based on his executive responsibility for administering DHHS personnel policies and his responsibility to enforce and to promote equal employment opportunity throughout the Agency. During the relevant time period, the DHHS has employed well-over 500 employees.

7. Charles L. Duffney is not a Defendant in this lawsuit but was named in Dr. Carson's EEO and EEOC complaints as a discriminatory official. Mr. Duffney is a Supervisory Technology Licensing Specialist assigned to GMG. The Agency's personnel records indicate that Mr. Duffney is the immediate supervisor of record for Dr. Carson. He is responsible for managing GMG administrative and operational activities and has held that position since February 2000. Mr. Duffney is one of the management officials most directly involved in taking adverse actions against Dr. Carson because of her sex, national origin and in reprisal for her internal complaints with NIH, and her EEO and EEOC charges. Mr. Duffney was also responsible for harassing Dr. Carson and retaliating against her. Mr. Duffney took other adverse personnel actions against Dr. Carson and created a pretext to hide his discriminatory motives. Mr. Duffney reports to Steven M. Ferguson.

8. Steven M. Ferguson is not a Defendant in this lawsuit but was named in Dr. Carson's EEO and EEOC complaints as a discriminatory official. From January 2003 to the present, Mr. Ferguson served as the DTDT Director and the Agency's personnel records indicate that he is Dr. Carson's second-level supervisor. He is one of the management officials most directly involved in taking adverse actions against Dr. Carson because of her sex, national origin and in reprisal for her internal complaints with NIH, and her EEO and EEOC charges. Mr. Ferguson also harassed Dr. Carson and retaliated against her. Mr. Ferguson took other adverse personnel actions against Dr. Carson, created a pretext to hide his discriminatory motives, and enabled Mr. Duffney to harass Dr. Carson and carry out discriminatory and retaliatory actions against her.

9. Mark L. Rohrbaugh is not a Defendant in this lawsuit but was named in Dr. Carson's EEO and EEOC complaints as a discriminatory official. Mr. Rohrbaugh is the Director of OTT and the Agency's personnel records indicate that he is Dr. Carson's third-level supervisor. He is one of the management officials most directly involved in taking adverse actions against Dr. Carson because of her sex, national origin and in reprisal for her internal complaints with NIH, and her EEO and EEOC charges. Mr. Rohrbaugh also harassed Dr. Carson and retaliated against her. Mr. Rohrbaugh took other adverse personnel actions against Dr. Carson, created a pretext to hide his discriminatory motives, and enabled Mr. Duffney and Mr. Ferguson to harass Dr. Carson and carry out discriminatory and retaliatory actions against her.

## FACTS

10. The averments set forth in paragraphs 1 through 9 are adopted and incorporated herein by reference.

11. Dr. Carson began work with DHHS on December 30, 2001 as a GS-601-13 TLS.

12. As a Technology Licensing Specialist, Dr. Carson is responsible for evaluating the commercial and patent viability of inventions; oversight responsibility for domestic and foreign patent prosecution; conducting commercial patent license and other technology transfer negotiations; and monitoring the performance compliance of licenses.

13. Dr. Carson has a B.A. in Biology (Neurobiology and Behavior) from Cornell University in Ithaca, NY. She began her doctoral studies at the Université de Paris VI, in Paris, France (Laboratoire de Neurobiologie, Ecole Normale Supérieure, Paris), earning a Doctorat du Troisième Cycle, Molecular Pharmacology. She then continued her studies in the United Kingdom and received a D.Phil. in Pharmacology from Oxford University, Lincoln College (Thesis Title: Biochemical Studies on Muscarinic Cholinergic Receptors). Dr. Carson is fluent in English and French.

14. During Dr. Carson's scientific career, she has concentrated in the areas of biochemistry, CNS, molecular biology and immunology. She specializes in the management of change and innovation with an interest in valuation of uncertain projects, particularly R&D, and in emerging technologies and markets.

15. Dr. Carson has over twenty (20) years experience and has worked and studied in France, the UK and Switzerland. Her background includes six (6) years of

commercial experience in consulting; virtual drug development as preclinical
director with a Roche funded subsidiary; and early stage biomedical technology
development, management and investment with a US not-for-profit company.
She has specific experience in strategically managing international project teams;
implementing and managing outsourced projects; and setting up a virtual
company. She also has experience in understanding and implementing complex
legal documents.

16. Upon her hire to the OTT, Dr. Carson's commercial and academic background
qualified her for a GS-14 position. The GS-13 and GS-14 TLS positions are
essentially the same with the only real differences being the degree of technical
expertise and amount of independence accorded to the employee. Upon her hire,
the Agency also told Dr. Carson that the TLS position had a promotion potential
to GS-14 and that she would be promoted after successful completion of her
probationary year. The Agency has refused to promote Dr. Carson to the GS-14
level for unlawful reasons. [1]

17. During her employment, Dr. Carson noticed that male employees were hired at
higher GS-levels then females with comparable credentials. She also observed
that male employees received promotions more quickly than female employees.
Further, the Agency gave male employees other benefits, such as awards and
bonuses, which female employees did not receive. Dr. Cason eventually filed
complaints internally within the Agency, as well as EEO and EEOC complaints,
concerning the disparities in treatment between male and female employees

---

[1] Dr. Carson does not seek back pay for the Agency's failure to hire her at the GS-14 level or for its failure
to pay her the same salary as similarly situated males in her department.

perpetuated by the Agency.  As a result of these complaints, management retaliated against her and subjected her to harassment.

18. Dr. Carson also observed other unequal treatment between male and female employees, particularly with respect to how DTDT management assessed performance standards.  Specifically, in 2002, when Dr. Carson joined the OTT team, where there were no standard operating procedures, best practices and/or policies regarding how employees were expected to implement or execute the specific job duties and/or responsibilities of the TLS GS-601-13 and TLS GS-601-14 positions.  DTDT management used this lack of standardized policies to create a pretext to discriminate against female TLS employees.

19. For example, Dr. Carson has never been provided clear explanation of management's expectation of her work output in terms of quality, quantity, and timeliness.  When Dr. Carson asked about the Division's policies on licensing, she was informed that the guideline manual was out of date.

20. Toward that end, in early 2002, Dr. Carson set about to create an infrastructure in the office that would facilitate informed decision-making by the TLS on licensing issues.  Because there was no knowledge management process within the office, this infrastructure would address common terms, acceptable language variation and best practices that would be easily available for all TLSs.  Dr. Carson created the infrastructure to facilitate her work with the intent of offering it to DTDT if it was deemed effective.  Dr. Carson spoke regularly with her supervisor, and in group meetings, about her ideas to formalize procedures and implement

uniformity. Mr. Duffney ignored Dr. Carson's efforts and did not provide her with any feedback or assistance.

21. Using this dearth of policies and procedures as a pretext, from January 2002 through the present, management has been able to subject Dr. Carson to differing and changing performance standards that are not imposed upon male TLS employees. Furthermore, when Dr. Carson complained about these discriminatory practices, management then falsely accused Dr. Carson of having poor performance and/or undertook other retaliatory and harassing actions.

22. Specifically, on at least two occasions (January 2002 and April 2002) Dr. Carson sought feedback, or a plan or criteria for promotion, and information about how she could best contribute to the group, without any response by any of her supervisors. During these times, Dr. Carson first noted that Mr. Duffney showed discomfort when dealing with her on these and other professional issues. Dr. Carson did not observe any such discomfort when Mr. Duffney dealt with the other male TLSs. He also refused her requests for meetings and limited her from any substantive discussion at the GMG meetings. She also tried to keep Mr. Duffney apprised of the status of her work, but he did not respond or acknowledge any of her e-mails nor did he make any substantive comments.

23. Unable to get any clarification, Dr. Carson also sought more detailed information from Dr. Jack Spiegel, the Director of DTDT, regarding what was expected from TLSs. During several conversations, Dr. Spiegel never once mentioned that TLSs were expected to meet a certain number of licenses to be promoted or that there was a critical timeline in preparing memoranda. Upon information and belief,

other TLS male employees were not required to meet such standards to advance their career within DTDT or to receive employment benefits.

24. Based upon conversations with her co-workers, as well as her interactions with her colleagues and other supervisors, Dr. Carson surmised that it was important to meet all patent bar dates; ensure that the attorneys, institutes and inventors were comfortable with timelines; provide good customer relation management; and that all statutory policies were followed. Dr. Carson accordingly followed these guidelines, focused on completing projects and provided her supervisor with licenses at the draft stage or earlier, particularly if there were any unusual circumstances. Upon information and belief, other TLS male employees were not required to meet such standards to advance their career within DTDT or to receive employment benefits.

25. It was not until seven months after Dr. Carson's futile initial attempts to get feedback from Mr. Duffney that, on or about August 21, 2002, he angrily yelled at Dr. Carson. The incident arose because Dr. Carson correctly informed Mr. Duffney that a technology which she had been assigned was not patentable. Dr. Carson had made this determination previously and had provided Mr. Duffney with her supporting documentation. At that time, she received no feedback. Then, on August 21st, Mr. Duffney exploded when Dr. Carson attempted to remind him of her earlier findings. He became angry, raised his voice and told her that if she did not process more licenses, Dr. Spiegel would dismiss her. He also shut Dr. Carson's office door, and in a physically threatening manner,

blocked the entranceway.  Mr. Duffney created an intimidating and hostile work environment.

26. In an effort to appease Mr. Duffney, Dr. Carson concentrated on providing him with several draft licenses.  Despite this work output, Mr. Duffney failed to respond and give her the necessary feedback to complete the licenses.

27. On or about September 24, 2002, Mr. Duffney had another unprovoked outburst. During this confrontation, instead of substantively discussing the work she had completed thus far, Mr. Duffney instead focused on procedural matters and demanded that Dr. Carson provide him with updates on all of her outstanding projects.  When Dr. Carson pointed out that other male TLSs were not expected to provide information on their assignments, Mr. Duffney became quite aggravated and started to yell at Dr. Carson.  He then blocked her office door in a physically threatening manner, made attacks on her professionalism and threatened that he was going to fire her.

28. Dr. Carson has not observed Mr. Duffney treat other male TLS employees in a similar manner and they have not been subjected to a threatening and intimidating hostile work environment.

29. The then acting Director of OTT, Mr. Rohrbaugh, was a witness to this hostility. Although Mr. Rohrbaugh told Dr. Carson that he spoke to Mr. Duffney and had resolved the situation, Mr. Duffney continued his harassment of Dr. Carson unabated.

30. Dr. Carson reported Mr. Duffney's behavior to Dr. Spiegel in September and November 2002 and he denied that he was aware of the incident.  However, he

acknowledged that Mr. Duffney's language was inappropriate and advised that she should have left to stop the conversation, ignoring the fact that Mr. Duffney had blocked the doorway. In essence, Dr. Spiegel blamed Dr. Carson for allowing Mr. Duffney to harass her.

31. This continued verbal abuse by Mr. Duffney has caused Dr. Carson anxiety. She has been traumatized by the uncontrolled anger directed toward her by Mr. Duffney for no rational reason. Dr. Carson had never been verbally abused in that manner by anyone in a professional setting. As a result, Dr. Carson continues to feel anxiety whenever she has to discuss work-related matters with Mr. Duffney.

32. Despite this harassment, Dr. Carson kept up with her performance and provided Mr. Duffney with seven (7) draft licenses in one month. These licenses had been planned for completion over a three (3) month period but Dr. Carson exceeded expectations by providing them ahead of schedule. Although Dr. Carson worked hard to meet and exceed Mr. Duffney's expectations, he nonetheless undermined her work by refusing to review most of the draft licenses she submitted. Upon information and belief, other TLS male employees were not required to meet such standards to advance their career within DTDT or to receive employment benefits.

33. During this time period, Dr. Carson was preparing for the patent bar which she put aside in order to provide the requested work product.

34. Mr. Duffney has taken every opportunity to stifle Dr. Carson's professional growth by failing or refusing to provide her with any feedback. Toward this end, despite her qualifications, as of December 31, 2002, when Dr. Carson met the

time in grade qualification requirements, the Agency has unlawfully refused to promote her. [2]

35. More specifically, Dr. Carson complained about the fact that she was not promoted to Mr. Duffney on or about February 13, 2003, but he refused to discuss any potential promotion for Dr. Carson. Shortly thereafter, in March 2003, Dr. Carson formally requested a promotion review from Mr. Rohrbaugh and Mr. Ferguson. Dr. Carson expressed her concerns that she had meet all of her performance standards, and that other male TLS employees were not held to similar work expectations. Dr. Carson also indicated that DTDT did not have clear guidelines or procedures for performance standards and that she was not being treated equality. Despite providing detailed documentation of her concerns and the accomplishments she made during 2002, in April and May 2003, Mr. Rohrbaugh and Mr. Ferguson all but ignored Dr. Carson and failed to address her complaint.

36. Unable to get any meaningful or substantive response from her immediate management chain regarding the disparities, unequal treatment, and differing performance standards, on or about April 4, 2003, Dr. Carson approached the Ombudsman regarding management's hostile and biased treatment of her.

37. In retaliation for voicing her concerns about inequitable and shifting performance standards, and for raising her concerns with the NIH Ombudsman, on or about June 18, 2003, Dr. Carson learned from Mr. Duffney that she would not receive a promotion. Specifically, Mr. Duffney harassed Dr. Carson by providing her with a memorandum which included several factual inaccuracies to hide his biased

---

[2] Dr. Carson does not seek back pay for the Agency's failure to promote her.

decision-making. Aghast that such inaccuracies were made, on or about June 20th, Dr. Carson immediately made a complaint to Mr. Ferguson. On or about July 3, 2003, Mr. Ferguson supported and enabled Mr. Duffney's harassment and retaliation and concurred with his pretextual decision-making. [3]

38. In July 2003, management continued with its harassment. In an attempt to be proactive, Dr. Carson set up licensing meetings in Boston and provided additional licensing opportunities to the office. Not surprisingly, her attempts were thwarted by Mr. Duffney and Mr. Ferguson. In sharp contrast, however, Dr. Carson's male colleagues did not receive this kind of response from senior management when they proactively sought to set up licensing deals. This caused Dr. Carson to suffer from low morale and anxiety. Furthermore, to add insult to injury became aware that some of her female colleagues in DTDT who are highly qualified were denied promotions to a GS-14 while similarly situated males were promoted.

39. On or about July 31, 2003, Mr. Duffney sent Ms. Carson an e-mail which detailed what he expected her to accomplish in the month of August. He did not send these types of e-mails to male TLS employees in the office. Again, this was consistent with the way Mr. Duffney singled out Dr. Carson for harassment.

40. On or about August 4, 2003, concerned with the arbitrary and random nature of Mr. Duffney's demands and deadlines, she alerted Mr. Ferguson, putting him on notice of Mr. Duffney's requests. Again, no action was taken by upper management to protect Dr. Carson from harassment.

---

[3] Dr. Carson's damages for retaliation do not accrue until after November 14, 2003, the date when she began to file EEO complaints. Nonetheless, the facts concerning management's response to her internal complaints provide crucial background and are included herein.

41. On or about the same time. Dr. Carson's brother, her only surviving family member, died suddenly. Dr. Carson took an eight day leave of absence to attend her brother's funeral and other family matters.

42. On or about September 5, 2003, when she retuned from leave, Dr. Carson requested an extension for some of the deadlines Mr. Duffney had listed in his July 31st email.

43. Mr. Duffney shocked Dr. Carson when he indicated he would only extend her deadline for as many days as she was absent from the office.

44. Dr. Carson, under an enormous amount of stress and grief, pleaded with Mr. Duffney in an email dated September 8, 2003, to give her an extension to comply with his demands. She stated that Mr. Duffney's demands were not time sensitive and she was doing all that she could to keep her current docket which was time sensitive. She copied Mr. Ferguson and Mr. Rohrbach, hoping that perhaps they would intercede on her behalf. They did not.

45. Mr. Duffney continued with his harassment by threatening disciplinary action if Dr. Carson did not comply with his request. He also indicated that she was not to use any overtime in order to comply with his demands.

46. On or about October 2, 2003, at wits end, and becoming increasingly unable to cope with the hostile work environment, Dr. Carson made a final plea to Mr. Ferguson and Mr. Rohrbaugh for feedback of Mr. Duffney's actions. Mr. Ferguson indicated it was up to her supervisor, Mr. Duffney to establish timeframes and guidelines to manage workloads. Mr. Rohrbaugh, altogether

- 14 -

ignored Dr. Carson's plea. Ignoring Dr. Carson had become common place at OTT.

47. After enduring months of harassment and disparate treatment with no intercession from Human Resources, higher level management, or the Ombudsman's office, Dr. Carson realized that she had to get assistance to stop management from subjecting her to a hostile environment. Thus, on or about November 14, 2003, Dr. Carson made initial contact with the EEOC.

48. Unable to withstand the ongoing abuse and hostility, on or about December 11, 2003, Dr. Carson filed her formal EEO complaint.

49. Subsequently, as Defendant's requests for superfluous documentation and unreasonable demands for work products further increased, Dr. Carson's extreme stress and anxiety levels increased. Such unusual requests were not required of other similarly situated male TLSs. These requests also prevented Dr. Carson ability to carry out duties as a TLS effectively. Each day was exceedingly difficult as she saw the demands on her increase ten-fold as compared to her male counterparts.


**Retaliatory Actions and Continued Harassment**

50. Since filing her formal EEO complaint, Mr. Duffney has continuously retaliated against Dr. Carson and held her to entirely different standards than other similarly situated male employees. Specifically, Mr. Duffney made repeated requests of Dr. Carson that he did not make of other male TLS Specialists and held her to

different and impossible performance standards as pretext to achieve his discriminatory purposes.

51. In September 2004, for example, Mr. Duffney retaliated against Dr. Carson and harassed her by unfairly criticizing her in an interim performance review. Although she asked for feedback, Mr. Duffney, in his typical modus operandi, ignored her requests for clarification.

52. In October and November 2004, Mr. Duffney continued his retaliation by harassing Dr. Carson with a number of emails regarding workplace issues and by unfairly criticizing her performance.

53. On or about February 11, 2005, Mr. Duffney continued the retaliation and harassment by writing unsubstantiated statements in Dr. Carson's 2004 Performance Review and rating her unacceptable. This went against Agency policy which required that a supervisor provide feedback to an employee on quantity, quality, articulation of work product, as well as the requirements for the employee to achieve the next grade level. Although an HR employee informed Mr. Duffney of this policy, he chose to ignore it when it came to Dr. Carson. He further failed to give Dr. Carson any clear explanation of the criteria required for a promotion to GS-14. Rather, based on these unsubstantiated and concocted remarks, Mr. Duffney denied Dr. Carson a career-ladder promotion yet again.[4]

54. On or about March 16, 20005, Dr. Carson attended a USPTO Personal Interview. While this is considered an integral part of a TLS's position and is a highly desirable and positive experience, Mr. Duffney categorized Dr. Carson absence as

---

[4] Dr. Carson does not seek back pay for the Agency's failure to promote her.

unapproved. All other male personnel are allowed to attend such meetings without reprisal.

55. On March 24, 2005, in retaliation for filing her EEO complaint, Mr. Duffney officially reprimanded Dr. Carson for providing a list of licenses to him which he claimed were not in the particular font, layout and format that he wanted. According to management, and supported by Human Resources ("HR") officials, the supposed failure to provide the license list in a particular format constituted misconduct.

56. This disciplinary action was pretext, especially since Dr. Carson had specifically asked Mr. Duffney about his specifications for formatting the list of licenses. However, wanting her to fail in order to have an excuse for a disciplinary action, Mr. Duffney did not provide Dr. Carson with any clarification. Given the lack of performance standards, and the failure by Mr. Duffney to provide a template for the project, Dr. Carson could not have satisfied his unrealistic expectations. Upon information and belief, other TLS male employees are not required to meet such standards nor are they disciplined for similar performance conduct. This unfounded disciplinary action will remain in Dr. Carson's personnel file for a period of up to two years and could result in more severe disciplinary action, including removal, if management makes further false accusations of misconduct.

57. Alarmed and flabbergasted that she was accused of misconduct for allegedly providing a memorandum in the wrong font and format, Dr. Carson inquired to HR as to the definition or meaning of what constituted "misconduct." No one responded to Dr. Carson with any clarification as to what "misconduct" meant.

Because of this, Dr. Carson remains in a constant state of anxiety, fearful that any work project or innocent behavior could be construed by Mr. Duffney or other management officials as "misconduct" and used as pretext to bring about her removal.

58. On March 24, 2005, Dr. Carson also received a Performance Improvement Plan ("PIP") based upon the retaliatory unacceptable performance review she received in February 2005 for the 2004 Performance Review period. The PIP contains both factually incorrect information and misquotes e-mails between Dr. Carson and Mr. Duffney which are taken out of context. When Dr. Carson tried to point out and correct the inaccuracies in the PIP to HR and Mr. Duffney, she was ignored.

59. In comparing the language in Dr. Carson's PIP to the standards set forth in HR policies, the PIP Dr. Carson was given is more extreme and absolute. For example, official HR policy states that management has discretion to initiate a lesser performance based action instead of termination when an employee fails to meet and sustain the elements in a PIP. In contrast, Dr. Carson's PIP has no such discretionary language and mandates that she would be removed from Federal Service if she failed to complete all the elements in the PIP. Given the superior quality of Dr. Carson's work, the satisfaction of her customers, and the accuracy of her technology recommendations, the PIP is extreme and unfounded. This action demonstrates the retaliation and harassment Dr. Carson has to bear from management. Upon information and belief, other TLS male employees were not

required to meet such standards nor are they disciplined for similar performance conduct.

60. Dr. Carson successfully completed the retaliatory PIP on May 27, 2005. However, management still has a convenient pretext to further retaliate against Dr. Carson as it remains active through March 28, 2006 and Dr. Carson could still be removed from Federal Service if Mr. Duffney or management officials rate her performance as unacceptable, all without the opportunity to improve. Given the unequal, constantly shifting and unrealistic expectations of Mr. Duffney, Dr. Carson remains in a state of anxiety and apprehension. She is held to absolute standards which other male employees are not expected to achieve.

61. Mr. Duffney continued to retaliate against Dr. Carson by sending her numerous harassing e-mails that accused her of unprofessional behavior. For example, Mr. Duffney accused Dr. Carson of being disrespectful when she quipped to Mr. Duffney, "this will be fun," in response to being given the retaliatory PIP, an obvious attempt by Dr. Carson to deflate the tension and stress of being falsely accused of poor performance. Despite the fact that Dr. Carson clearly did not mean to be impertinent, Mr. Duffney nonetheless responded with an extreme threat of removal for her guileless comment. On another occasion, Mr. Duffney accused Dr. Carson of supposedly "sneering" at him. Dr. Carson sought clarification of when this supposedly occurred and other details, but was again ignored. Dr. Carson did not engage in any such alleged inappropriate behavior. Yet Mr. Duffney engages in petty behavior and unfounded accusation to further harass and retaliate against Dr. Carson. Upon information and belief, unfounded

accusations are not made against other TLS male employees and they are not threatened with disciplined for similar conduct.

62. Mr. Duffney continues to retaliate against Dr. Carson and continues to send her numerous harassing e-mails concerning performance and other work place matters. Each time Mr. Duffney engages in such behavior, Dr. Carson reviews his remarks and sends a rebuttal and/or request for clarification, as necessary. No follow-up or feedback is ever provided by Mr. Duffney. This constant harassment by Mr. Duffney has created a workplace scenario for Dr. Carson which makes it impossible for her to comment or express any work related opinion. Dr. Carson is apprehensive of saying anything for fear that Mr. Duffney or other management officials will use it as pretext to take further adverse action. Dr. Carson has been placed in a no-win situation by Mr. Duffney where, irrespective of Dr. Carson's satisfactory work performance, he or other management officials can utilize any comment or less than perfect action by Dr. Carson as a pretext to bring about her removal from Federal service in retaliation for her protected activities. This leaves Dr. Carson in a constant state of anxiety and worry.

63. In June 2005, Mr. Ferguson called Dr. Carson into his office and accused her of using "inappropriate language" towards a Program Specialist, an incident which allegedly occurred several months earlier. Confused as to why this incident was suddenly of a concern to management, Dr. Carson sought clarification and the exact details of what was alleged to have occurred. Dr. Carson's pleas fell on deaf ears, and she was only informed that Mr. Duffney went directly to the Deputy Director with the accusation with the apparent intent to use the incident to

- 20 -

support taking other retaliatory, adverse actions against Dr. Carson. This hostile environment has negatively impacted the terms and conditions of Dr. Carson's employment and has made it increasing difficult for Dr. Carson to efficiently carry out her job duties and responsibilities due to the anxiety and stress created by management's harassment of her. Upon information and belief, unfounded accusations are not made against other TLS male employees and they are not threatened with disciplined for similar conduct.

64. On or about March 24, 2005, Dr. Carson became aware that Mr. Duffney and/or other management officials had denied her a merit award for her excellence in handling a particular case. More specifically, a cash award was authorized for Dr. Carson in August 2004 by NIH/NHGRI. Dr. Carson was unaware that she had been recommended to receive the award and did not learn that management had blocked her from receiving it until she received an e-mail about the incident in March 24, 2005.

## EXHAUSTION OF REMEDIES

65. Dr. Carson exhausted all administrative requirements that apply to the processing of her complaint, including the filing of a formal charge with the Agency's EEO office and filing an EEOC complaint. Dr. Carson filed this complaint within ninety (90) days of receiving a Final Agency Decision.

## STATEMENT OF CLAIMS

### COUNT I:  Sex Discrimination in Violation of Title VII

66. Dr. Carson re-alleges paragraphs 1-65 and incorporates them fully herein.  Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, has discriminated against her on the basis of her sex (female) by denying her employment opportunities and subjecting her to adverse and disparate treatment.  Dr. Carson further alleges that these acts violate Title VII and that she has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

67. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

68. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

### COUNT II:  National Origin Discrimination in violation of Title VII

69. Dr. Carson re-alleges paragraphs 1-68 and incorporates them fully herein.  Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, has discriminated against her on the basis of her national origin (British) by denying her employment opportunities and subjecting her to adverse and disparate treatment.  Dr. Carson further alleges that these acts violate Title

VII and that she has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

70. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

71. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

### COUNT III: Harassment Based on Sex in violation of Title VII

72. Dr. Carson re-alleges paragraphs 1-71 and incorporates them fully herein. Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, harassed plaintiff based on her sex (female) by denying her employment opportunities and subjecting her to adverse and disparate treatment. Dr. Carson further alleges that these acts violate Title VII and that she has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

73. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

74. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

**COUNT IV:  Harassment Based on National Origin in violation of Title VII**

75. Dr. Carson re-alleges paragraphs 1-74 and incorporates them fully herein.  Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, harassed plaintiff based on her national origin (British) by denying her employment opportunities and subjecting her to adverse and disparate treatment. Dr. Carson further alleges that these acts violate Title VII and that she has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

76. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

77. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

**COUNT V:  Harassment Based on Engaging in Activities Protected by Title VII**

78. Dr. Carson re-alleges paragraphs 1-77 and incorporates them fully herein.  Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, harassed plaintiff for engaging in protected activities by denying her employment opportunities and subjecting her to adverse and disparate treatment. Dr. Carson further alleges that these acts violate Title VII and that she has

suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

79. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

80. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

## COUNT VI:  Retaliation Against Dr. Carson for Engaging in Activities Protected by Title VII

81. Dr. Carson re-alleges paragraphs 1-80 and incorporates them fully herein.  Dr. Carson additionally alleges that Defendant, and/or agents or employees acting on its behalf, retaliated against Dr. Carson for her opposition to Defendant's unlawful employment practices and her participation in protected activity and the EEO process.  As a result of the retaliation, Dr. Carson has been denied employment opportunities and has been subjected to adverse and disparate treatment.  Dr. Carson further alleges that these acts violate Title VII and that she has suffered and will continue to suffer severe emotional and mental distress and loss of employment opportunities and career advancement.

82. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson has suffered grievous harm to her professional career and reputation and continues to suffer such harm.

83. As a direct and proximate result of the intentional acts of Defendant and/or agents or employees acting on its behalf, Dr. Carson additionally has suffered great

emotional distress, embarrassment, humiliation, pain and anguish, and continues to suffer such harm.

## **RELIEF SOUGHT**

WHEREFORE, Dr. Carson demands judgment against DHHS and prays:

A. That this Court direct the Defendant to cease its harassment and retaliation of Dr. Carson and to take such affirmative action as is necessary to ensure that the effects of its unlawful employment practices are eliminated and do not continue to affect Dr. Carson's employment opportunities;

B. That this Court award Dr. Carson compensatory damages in the amount of $300,000;

C. That this Court award Dr. Carson pecuniary and out of pocket expenses;

D. That this Court grant Dr. Carson reasonable attorney's fees and any other costs of this action, as well as prejudgment and post-judgment interest; and;

E. That this Court award Dr. Carson such other and further relief as may be deemed just and equitable.

## JURY DEMAND

Plaintiff requests a trial by a jury of her peers as to all claims set forth in this Complaint.

Respectfully submitted,

Camilla C. McKinney
D.C. Bar No.  448776
Law Offices of Camilla C. McKinney, PLLC
1100 Fifteenth Street, N.W., Suite 300
Washington, D.C.  20005
(202) 861-2934 (telephone)
(202) 517-9111 (facsimile)
CMcKinney@DCEmploymentLawyer.com

Attorney for Plaintiff Dr. Susan Carson